THE STATE v. SNYDER, Appellant.

Division Two, June 14, 1904.

1. **INDICTMENT: Limitations: Pleaded.** The indictment should plead the exceptions which are necessary to remove the bar of the statute of limitations.

2. ——: ——: **Proper Pleading.** The indictment returned on April 5, 1902, charged "that since the 22nd day of March in the year 1898 the said defendant has not been an inhabitant of or usually resident within the State of Missouri." *Held*, that it sufficiently alleged facts which, if true, would remove the bar of the statute of limitations otherwise apparent on its face. It was not necessary to allege only that the defendant was not an "inhabitant," or that he was not "usually resident," or both conjunctively, since taken together as averred they charged one and the same thing.

3. ——: ——: **Separate Plea.** It is unnecessary for defendant to plead the statute of limitations as a bar to the prosecution in order to have the benefit of it. Where the indictment tenders that issue a plea of not guilty traverses it.

State v. Snyder.

4. ———: ———: ' Separate Trial. Nor is the defendant entitled to a separate preliminary trial, by the same or another jury, of the issue that the statute of limitations is a bar to the prosecution.

5. JUROR: Challenge After Trial Begun: Opinion As To Punishment. After the jurors had been tested on their *voir dire* and all found competent and accepted by both sides, and the State's attorney had made his opening statement, one of them inquired of the court if it was their duty to pass on anything else except the guilt or innocence of the defendant, and being assured by the court that that was all, asked if the jury had anything to do with the punishment to be fixed, and on being told by the court that the jury would receive instructions from the court when the case was closed, said that the only reason he made the inquiry was that he had expressed an opinion on that matter, and thereupon the court directed him that he did not wish to hear further from him. Then the State examined two witnesses and while a third was being examined the defendant interposed a special challenge of the juror's competency. *Held,* first, that the challenge came too late; and, second, the fact that the juror held special notions as to his duty in fixing the punishment, did not affect his competency as a juror.

6. LIMITATIONS: Inhabitant and Usually Resident: Synonyms. Under the Missouri statute of limitations concerning the prosecution of criminals, the time during which any defendant is not "an inhabitant of or usually resident within this State" is not to be counted as a part of the limitation in his favor. *Held,* that the words "inhabitant of" and "usually resident within," thus used in the same context and co-ordinated by the conjunction "or," are synonymous. The words "usually resident" are used to illustrate the meaning of the word "inhabitant."

7. ———: ———: Indictment: Uncertainty. If the word "inhabitant," as used in the statute, has an essentially different meaning from the words "usually resident," then the indictment is uncertain in that it fails to charge the specific ground upon which it sought to avoid the bar of the statute of limitations. But having the same meaning, the general allegation in the language of the statute is not objectionable for uncertainty.

8. ———: ———: Burden on State. Where the indictment charges facts which avoid a bar to a prosecution otherwise barred, the burden is on the State to show those facts.

9. ———: ———: Instruction. An instruction which draws a distinction between the word "inhabitant" and the words "usually resident," used in the same context in the statute of limitations, telling the jury that the question of whether or not the defend-

State v. Snyder.

ant during the period between the commission of the crime and the return of the indictment was an "inhabitant" of this State was not for their consideration, but that if they found that he was not "usually resident" within this State the statute of limitations was not a bar, is error.

10. ———: ———: ———: **Elimination of Question of Habitation.** An instruction that undertakes to define what is meant by the words "usually resident within this State" and forbids the jury to inquire whether or not defendant was an "inhabitant of this State," is error. The idea of inhabitancy is necessarily involved in usual residence. The effect of such an instruction is to confuse the jury.

11. ———: ———: **Absence.** It is not mere absence from the State which stops the running of the statute of limitations, but such absence as destroys residence.

12. ———: ———: ———: **Words of the Instruction.** The controlling facts upon which the trial court permitted the jury to find, not that defendant had changed his domicile or residence from Kansas City to New York, but ceased to be "a usual resident" of Missouri, were embodied in an instruction which told the jury that if after the commission of the offense in March, 1898, "defendant went to New York, and there engaged in business and there had a permanent office and place of business, and there occupied apartments before and after his marriage which were engaged by the year, having them as an established abode in New York, then you may find from such facts that during the period of time he was in New York he was not usually resident within the State of Missouri, although you may also find that he had a home in Kansas City where his children resided and to which he occasionally returned." *Held,* that the vice of this instruction is that it asserts that defendant was no longer a usual resident of Missouri if he went to New York and engaged in business and had a permanent office there and occupied apartments at a hotel which were engaged by the year. *Held,* also, to be erroneous as an unwarranted comment on the evidence, in that it characterized defendant's place of business in New York as "a permanent office and place of business," there being no evidence that it was permanent.

13. ———: ———: **Change of Residence: Doing Business Elsewhere.** A defendant does not lose his domicile and residence by going to another State to engage in business even if he has a permanent office in such State and even though in carrying on that business he rents apartments by the year in a hotel there. Such facts are not conclusive of a change of residence when facts to the contrary of a far more conclusive character appear.

14. ——: ——: ——: ——: **Facts Contra.** Defendant had
been a man of family and lived in Kansas City; he owned a
$50,000 residence there, in which his family and minor children
continuously resided for many years prior to the finding of the
indictment and up to the trial; his wife died, and after that his
sister-in-law lived with him and kept his house, keeping his
three sons there; he refitted the house just about the time the
crime was committed; he was president of a bank there until
it was merged into another bank two years later, of which he
was also elected president and continued so to be until after
he was indicted; he was married in another State a second time
two years before the indictment was found, at a time he had
an office in New York and occupied apartments there at a hotel
which he paid for by the year; his marriage certificate gave his
residence as Kansas City, and he brought his wife to live in
his residence there, and his children attended the public schools
there, and twenty-eight persons testified to the unbroken con-
tinuity of his residence there, and of meeting him from day to
day as they met other active business men and residents of the
city. *Held,* that these facts show, in view of the fact that our
statute defines residence as "the place where his family per-
manently resides," that defendant had a permanent residence in
Kansas City, and there appearing no evidence of any intention
on his part to abandon his home and residence there and to
take up his residence in New York, the statute of limitations
was a bar to the prosecution.

15. ——: ——: **Residence: Intention.** A man's residence is
largely a matter of intention.

16. ——: ——: **Statute How Construed.** The statute of limi-
tations prescribing that "the time during which any defendant
shall not have been an inhabitant of or usually resident within
this State shall not constitute any part of the limitation" of
three years, is to be liberally construed in favor of the de-
fendant.

17. **REMARKS OF ATTORNEY: No Denial by Defendant.** The de-
fendant was indicted for bribery and the evidence showed that
only he and the prosecuting witness were present when the
offer was made, and the circuit attorney referred to this fact
and said he believed that witness told the truth, and "it has
not been denied." Defendant excepted, and the circuit attor-
ney said, "I do not refer to any party," and the court said, "I
tell the jury that it can not have any reference to defendant."
*Held,* that it is apparent that the circuit attorney did refer to
defendant's failure to testify and to deny the testimony of the
prosecuting witness although he may not have so intended, and
the remarks of the court accentuated the reference, and the
error is reversible.

Vol 182 mo—30

State v. Snyder.

Appeal from St. Louis City Circuit Court.—*Hon.* *O'Neill Ryan,* Judge.

REVERSED AND REMANDED.

*Boyle, Priest & Lehmann, Morton Jourdan* and *William Warner* for appellant.

(1) The indictment, in its charge that since the twenty-second day of March, 1898, defendant had not been an inhabitant of or usually resident within the State of Missouri, states a legal conclusion and not primary facts, and is indefinite and uncertain as to whether the defendant is charged with not being an inhabitant of the State of Missouri during that period, or is charged with not being usually resident within the State during that period. R. S. 1899, secs. 2419 and 2421; 21 Ency. Plead. and Prac., 649; Bishop on Statutory Crimes, sec. 1043; State v. Carver, 12 R. S. 285; Com. v. Hadcraft, 6 Bush (Ky.) 91; State v. Burns, 20 N. H. 550; Wharton, Crim. Plead. and Prac., 161. (2) Defendant was entitled to a trial upon his plea in bar setting up the statute of limitations. R. S. 1899, sec. 2419; U. S. v. Cook, 17 Wall. 168; U. S. v. White, 28 Fed. Cas. 568; Thompson v. State, 54 Miss. 740; People v. Roe, 5 Park. Crim. Cas. 231; State v. Thrasher, 7 Atl. 814; Kelly's Crim. Law and Prac., sec. 124; Wharton's Crim. Plead. and Prac., sec. 419; State v. Huffman, 136 Mo. 58; State v. Hatcher, 136 Mo. 642; State v. Laughlin, 168 Mo. 415; State v. Wear, 145 Mo. 162; Norton v. U. S., 91 U. S. 566. (3) Juror Anderson, after the jury had been impaneled, disclosed an opinion respecting the case, not indicated on his *voir dire,* and the challenge to him should have been sustained. (4) The evidence tends only to show an attempt at bribery, and the verdict and judgment of guilty of bribery is therefore erroneous. (5) Upon the whole testimony, it was shown beyond controversy that at the time of the commission of the offense and

until the time of the trial, defendant was an inhabitant of and usually resident within the State of Missouri, and the court should have instructed accordingly. (6) Defendant was entitled to have the question of his residence determined independently of and before the question of his guilt was considered by the jury. (7) Defendant having been an inhabitant and resident of Kansas City, the presumption was that he continued to so be until shown to have established a residence elsewhere. Hatch v. Lowell, 6 Kan. App. 645; Chaine v. Wilson, 1 Bosw. (N. Y.) 673. (8) The burden of proof was on the State to show that defendant was not an inhabitant or resident of the State. State v. Schuerman, 70 Mo. App. 518; Worrall v. State, 27 Fla. 362; Weinett v. State, 35 Fla. 229; State v. Snow, 30 La. Ann. 401; State v. Anderson, 57 La. Ann. 1181; Loller v. Abernathy, 37 Mo. 196; R. S. 1899, sec. 4160; Blashfield on Instructions, secs. 346-348; Simpson v. Shoe Co., 70 S. W. 305; Watkins v. Martin, 65 S. W. 103; Wood's Limitations (3 Ed.), 116. (9) The statute of limitations is not suspended so long as a person is an inhabitant of or usually resident within the State. The terms "inhabitant" and "usually resident" are synonymous, but if they are to be construed as distinctive and different the statute runs on under either alternative. Graham v. Com., 51 Pa. St. 255; People v. McCausey, 65 Mich. 72; Com. v. Woodward, 1 Chest. Co. Rep. 102; People v. Roe, 5 Park. Crim. Rep. 231; 21 Am. and Eng. Ency. of Law, 936; Kennedy v. Ryall, 67 N. T. 386; Rex v. Adlard, 4 B. & C. 772; Mead v. Carroll, C. D. C. 338; Church v. Powell, 49 Me. 367; Sears v. Boston, 42 Mass. 242; Walker v. Walker, 1 Mo. App. 404; Chaine v. Wilson, 1 Bosw. 673; McConnell v. Kelley, 138 Mass. 372; Grant v. Dolliver, 11 Conn. 234; Cunningham v. Maund, 2 Ga. 7; Lee v. Stanley, 9 How. Prac. 272; Merrill v. Morrisett, 76 Ala. 437; State v. Ross, 23 N. J. L. 527; Blucher v. Milsted, 31 Tex. 621; Com. v. Hadcraft, 6 Bush (Ky.) 91. (10) By its instructions upon the question of limitations the

court unfairly commented on the testimony, assumed facts on behalf of the State which had not been proven, and in presenting the case on behalf of defendant omitted important evidentiary presumptions and material facts which had been conclusively proven. Edgerton v. Wachter, 4 N. W. 85; McCord v. Woodhull, 27 How. Prac. 54; Bennett v. Cook, 47 N. Y. 537; State v. Hobler, 149 Mo. 478; State v. Rutherford, 152 Mo. 124; Kerwin v. Sabin, 36 Am. St. Rep. 645. (11) The prosecuting attorney commented to the jury upon the fact that defendant had not testified, and the court was drawn by conduct of the prosecutor also to comment upon it. State v. Weaver, 165 Mo. 13; Wilson v. U. S., 149 U. S. 60; McKnight v. U. S., 115 Fed. 972; Jackson v. U. S., 102 Fed. 473; Showalter v. State, 84 Ind. 562; State v. Holmes, 68 N. W. 11; State v. Moxley, 102 Mo. 374; Dawson v. State, 24 S. W. 414; Brazell v. State, 26 S. W. 723; State v. Granger, 77 N. W. 336; Baker v. State, 25 So. 238; State v. Deves, 61 Pac. 511; People v. Payne, 91 N. W. 739.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State; *Jos. W. Folk* of counsel.

(1)   It is asserted that the indictment charges that since the twenty-second day of March, 1898, the defendant had not been an inhabitant of or usually resident within the State of Missouri. It is contended that this charge is more in the shape of a legal conclusion than of primary facts, and that it is indefinite and uncertain as to whether the defendant is charged with not being an inhabitant of the State of Missouri during that period or is charged with not being usually resident within the State during that period. So far as this particular fact is concerned, it makes no difference in criminal prosecutions whether the indictment alleges failure in the running of the statute of limitations or not. The indictment

would have been good had the prosecutor eliminated therefrom this statutory negation. State v. Gill, 33 Ark. 129; State v. Hussy, 7 Ia. 409; Thompson v. State, 54 Miss. 740; State v. Watts, 10 Il. (N. C.) 369; Blackburn v. Commonwealth, 124 Pa. St. 578. If, therefore, it be unnecessary to allege such fact in the indictment, the fact that it is alleged must be treated as surplusage, so that none of the substantial rights of the defendant are involved because of the ill manner in which the allegation is charged. These terms being used as synonyms, no injustice can be done defendant and no error was committed by the court in refusing to quash the indictment on that ground. State v. Moore, 61 Mo. 278; State v. Ellis, 4 Mo. 474; Brown v. Com., 8 Mass. 59. It may be true that the trial court took the view, in the presentation of the matter to him, that the terms were not synonymous and meant entirely different things, and that the circuit attorney also assumed the same position. This, however, would be an error that would not in any way affect the substantial rights of the defendant. It would be an error of an immaterial character; one which in no way discredited defendant's rights. (2) Defendant insists that he was entitled to a trial upon his plea in bar, setting up the statute of limitations. The court submitted the issues of fact contained in the plea in bar, but held that it was proper to submit the questions raised in the plea, together with the question as to the guilt or innocence of the defendant, to one jury and at one trial, and correctly so. State v. Manning, 168 Mo. 418; State v. Laughlin, 158 Mo. 415. (3) It is plain from the record that the objection to juror Anderson came too late. (4) The instructions are fair and proper. They do not comment upon the testimony and clearly present to the jury the law bearing upon the case and as applicable to the facts shown in evidence. The State introduced evidence showing that defendant has not been an inhabitant of or usually resident within the State of Missouri since the twenty-second day of March,

1898. Against this testimony defendant introduced evidence, and it is not for this court to weigh the relative reasonableness of the testimony in this respect. An appellate court will not invade the jurisdiction of the jury. It became and was the duty of the jury to determine from the evidence whether or not the allegation contained in the indictment in this particular was true, and the jury having found for the State, this court will not undertake to open up that question of fact.

GANTT, P. J.—On the fifth day of April, 1902, the defendant was indicted by the grand jury of the city of St. Louis for bribery of an officer, to-wit, a member of the Municipal Assembly of said city. The indictment, omitting caption, is in the words following:

"The grand jurors of the State of Missouri, within and for the body of the city of St. Louis, now here in court duly impaneled, sworn and charged, upon their oath present: That on (or about) the twenty-second day of March in the year one thousand, eight hundred and ninety-eight the said city of St. Louis was a municipal corporation in the said State of Missouri, and that the legislative power of the said city of St. Louis was by law vested in a Council and a House of Delegates, styled the Municipal Assembly of the city of St. Louis, the members whereof were elected by the qualified voters of said city; that one Frederick G. Uthoff was then and there a public officer of said city of St. Louis, to-wit, a member of said Council and of said Municipal Assembly, duly elected and qualified, and was then and there acting in the official capacity and character of a member of said Council.

"That there was then and there pending and undetermined before the said Municipal Assembly and in the said Council, and brought before the said Council for the consideration, votes and decision of the members thereof, as a legislative body of said city as aforesaid, and so before the said Frederick G. Uthoff in his said of-

ficial capacity and character as a member of said Council a certain measure, matter and proceeding, to-wit, a certain proposed ordinance of said city of St. Louis (known and designated as House Bill No. 451, and which had theretofore been passed by the said House of Delegates and certified therefrom to the said Council), whereby it was proposed that the said city of St. Louis should grant certain valuable privileges, rights, and franchises to the Central Traction Company of St. Louis (a railroad corporation), to-wit, the right to construct, operate and maintain a single and double track passenger railroad upon, along and across certain public streets and highways of said city of St. Louis. That it then and there became and was the public official duty of the said Frederick G. Uthoff, as a member of said Council and in his official capacity and character as aforesaid, to give his vote upon the said matter, measure and proceedings and for or against the said proposed ordinance without partiality or favor.

"That then and there one Robert M. Snyder, well knowing the premises, but then and there unlawfully, corruptly and feloniously devising, contriving and intending to corruptly influence the opinion, judgment and vote of the said Frederick G. Uthoff, in his said official capacity and character as a member of said Council and as a public officer as aforesaid, for and in favor of the passage and enactment of the said proposed ordinance, so pending and brought before the said Council as aforesaid, did then and there unlawfully, corruptly, and feloniously, directly and indirectly, make and enter into a corrupt understanding and agreement with the said Frederick G. Uthoff (as a member of the said Council) that upon the payment of a large sum of money, to-wit, the sum of fifty thousand dollars, by the said Robert M. Snyder to the said Frederick G. Uthoff, the said Frederick G. Uthoff would and should (as a member of said Council and in his official capacity as a public officer as aforesaid) give

State v. Snyder.

his vote for and in favor of the passage and enactment of
the said proposed ordinance by the said Council; and did
then and there unlawfully, corruptly and feloniously
(directly and indirectly) give the sum of fifty thousand
dollars in money to the said Frederick G. Uthoff (as a
member of said Council) as a gratuity, reward and bribe
to him, the said Frederick G. Uthoff (as a member of
said Council) under and in pursuance of the aforesaid
corrupt understanding and agreement that the said
Frederick G. Uthoff (as a member of the said Council)
would and should give his vote (as a member of said
Council) for and in favor of the passage and enactment
of the said proposed ordinance by the said Council.

"And that since the twenty-second day of March,
in the year one thousand eight hundred and ninety-
eight, the said Robert M. Snyder has not been an in-
habitant of or usually resident within the State of Mis-
souri. Contrary to the form of the statute in such case
made and provided, and against the peace and dignity
of the State.

"W. SCOTT HANCOCK,
"Assistant Circuit Attorney."

To this indictment the defendant filed a demurrer
which was overruled by the court. The grounds of the
demurrer were that the indictment charged no offense
under the laws of this State, that it was vague, indefi-
nite and ambiguous and did not inform the defendant of
the nature or cause of the accusation against him; that
it was shown by the face of the indictment that the al-
leged offense was barred by the statute of limitations,
section 2419, Revised Statutes of Missouri of 1899, and
does not plead any fact sufficient to avoid the running
of the said statute of limitations; that the allegation that
"since the twenty-second day of March, 1898, said Robert
M. Snyder has not been an inhabitant of or usually resi-
dent within the State of Missouri" is a legal conclusion,
not a statement of primary facts and is indefinite as to

whether the defendant is charged with not being an inhabitant of Missouri during said period or whether he is charged with not being usually resident within said State.

The demurrer having been overruled, the defendant filed the following special plea,. omitting caption:

"Now on this day comes the defendant, Robert M. Snyder, in his own proper person and by counsel, and for plea to the indictment herein says: That the State of Missouri, plaintiff, ought not to try and prosecute the indictment against him because the said indictment was not found within three years after the alleged commission of the alleged offense as is shown upon the face of the said indictment, and because it is charged in said indictment that the offense was committed on the twenty-second day of March in the year 1898, and the indictment was found, returned and filed on the fifth day of April, 1902.

"Defendant pleads such fact, together with section 2419 of the Revised Statutes of the State of Missouri of 1899, which said statute is in words and figures as follows: 'No person shall be tried, prosecuted or punished for any felony, save as specified in the next preceding section, unless an indictment be found for such offense within three years after the commission of the offense,' as a bar to said trial, prosecution or punishment. The defendant says that the exception provided in such section is one where the offense is punishable with death or by imprisonment in the penitentiary during life, and the defendant shows to the court that the offense charged in the indictment against him is not within the exception aforesaid, and that the punishment for the offense charged against him is by imprisonment in the penitentiary for a term of not less than two. or more than seven years.

"Defendant further says that it is not true, as charged in the indictment, that 'since the twenty-second day of

March, in the year 1898, said Robert M. Snyder has not been an inhabitant of nor a resident within the State of Missouri,' but, on the contrary, the defendant avers the fact to be that during all times from the twenty-second day of March, in the year 1898, and for many years prior thereto, and from the said twenty-second day of March, in the year 1898, until after the said fifth day of April, 1902, and until the present time, the defendant has been an inhabitant and resident in the city of Kansas City, in the county of Jackson, and the State of Missouri, and has, during all the times hereinbefore mentioned, had his home and domicile in the said city of Kansas City, and has himself with his family, been usually and customarily resident in the said city, and has been a citizen of said city and of the State of Missouri.

"Wherefore, the defendant pleads the foregoing facts and the said section 2419 of the Revised Statutes of Missouri for 1899 in bar of trial, prosecution or punishment under said indictment, and avers that to permit the State of Missouri to try, prosecute or punish him, the said defendant, under said indictment, or for said offense, would be a violation of section 2419 of the Revised Statutes of Missouri for 1899 aforesaid, and would deny to him the protection of the said statute.

"Wherefore, defendant prays the court by its proper entry of record to discharge him from the trial and prosecution of and punishment under said indictment now pending in said court against him, and from the trial and prosecution in this court of the alleged offense in said indictment charged."

When the cause was called for trial the defendant demanded a separate trial on the issue presented by this special plea, which the circuit court denied, and caused the defendant to be arraigned, and the defendant declining to plead further until the plea of the statute of limitations had been heard, the court directed a plea of not guilty to be entered, which was done, and defendant excepted to the action of the court. A jury was impaneled

and the trial proceeded. After the jury was sworn and the circuit attorney had made his opening statement the following occurred:

"Juror Anderson addressed the court: 'I would like to be understood on one point; we are merely to pass on the guilt or innocence of the defendant?'

"The court: 'Yes, sir; not anything else.'

"Juror Anderson: 'And we have nothing whatever to do with the penalty to be attached?'

"The court: 'You will get your instructions from the court when the case is closed, Mr. Anderson.'

"Juror Anderson: 'The only reason is I have expressed an opinion on such lines.'

"The court: 'Mr. Anderson, I don't care to hear anything further from you at this time. You are selected on the panel of this jury and you will get your instructions on the law when the case is closed.'

"Juror Anderson: 'All right.' "

Thereupon, Edward E. Goebel and Thomas E. Quinn testified on behalf of the State, and Charles R. Graves, another witness, had given a portion of his testimony when an objection was made to a certain question pronounced to him, and pending discussion of the point the jury were ordered to retire in charge of the sheriff. After they had left the court room, the defendant filed a written challenge to the juror Anderson on the ground that he had been misled by the answers of said juror on his *voir dire* examination; that the information as to said juror came to defendant after the statement of the circuit attorney when the said juror volunteered his statement above set forth; which, if defendant had known, he would have challenged said juror for cause, and if not challenged for cause he would have challenged him peremptorily; that to proceed with said juror as a member of the panel would be to deny defendant a trial by an impartial jury as guaranteed to him by the Con-

stitution of the United States and of Missouri, which challenge the court overruled and defendant excepted.

Various exceptions were taken to the admission of evidence, which will be noted, if necessary, in the course of the opinion. The evidence tended to prove who were the members of the House of Delegates and the Council of the Municipal Assembly of the city of St. Louis; the oaths of office administered to them for the time covering the date of the alleged bribery, and among others that one Frederick G. Uthoff was a member of the said Council from April, 1895, to April, 1899, and duly qualified as such.

Over the objection of defendant, the State introduced evidence to the effect that a bill for an ordinance known as House Bill No. 59 and spoken of as the "first North and South Bill," was introduced in the House of Delegates May 21, 1897, and that this bill was under consideration by the Council in July, 1897.

Like testimony was offered and received as to a "second North and South Bill" No. 282. This was shown to have been passed by the Council. Both of these bills were for grants of franchises to the North and South Railway Company, authorizing the construction, maintenance and operation of street railways in the streets of St. Louis. Testimony was then introduced with respect to the introduction into the Municipal Assembly of a bill known as House Bill No. 541, and the same is described in the indictment, which was an ordinance granting the Central Traction Company of St. Louis the right to construct, operate and maintain street railways over and along certain streets in the city of St. Louis. The various proceedings of the Council were read in evidence, from which it appeared that it passed both houses, was vetoed by the Mayor and again passed over the veto of the Mayor. The substance of the evidence as to the bribery of said Uthoff by defendant was as follows:

"F. G. Uthoff testified that he was a member of the

Council from April, 1895, to April, 1899. That the defendant called on him at his residence in the city of St. Louis on the third of April, 1898, in company with Louis C. Dieckmann, in pursuance of a previous arrangement for an interview. That defendant told him he had lived in New York and Kansas City; was a millionaire; and finally drifted to the Central Traction bill. That the defendant told him he lived in New York at that time, that is, that he had made his money in the real estate boom in Kansas City, and had let go just at the right time, and then went on to New York.

"Uthoff told defendant that he had been offered $50,000 to vote for that bill, and defendant replied that this was more money than he had at his command at the present, but if Uthoff would vote for the bill, he would get and send it down by Mr. Dieckmann. Uthoff never positively told Mr. Snyder he would vote for the bill for $50,000 or any other amount. He states that the next day Mr. Dieckmann came to his house with an envelope, which he left on the sofa. After Dieckmann left, Uthoff took the package and put it away. A few days after, Uthoff told defendant he could not vote for the bill, and to get the money back. The day after this defendant came to his house, and then Uthoff opened the package for the first time and saw in it $1,000 bills, twenty-five in number, and other kinds of paper, which look like notes and checks. Defendant told him he had better keep this, but he said 'No,' and defendant took away the package.

"Later on at the Planters Hotel he met defendant and defendant agreed to give him $100,000 to vote for the Central Traction bill and a gas bill. Uthoff testified 'I never said positively I would vote for it, I said, "If I can help you through with it, I will do it." '

"Uthoff states that defendant never returned to him any part of this $50,000, and he denies over and over again that he agreed to vote for the bill, and in fact, he did not vote for it upon its first passage, although when it was returned with the objections of the Mayor

he voted to pass it over the veto.   He denies explicitly and repeatedly that he did this in consideration of any bribe, or in pursuance of any agreement with the defendant.   He states that he had received $25,000 from another person to vote against the bill, and that he returned this money because he had voted for it and so had not earned it.   He states also that he had been for some months in receipt of a monthly stipend, amounting to $5,000 a year, which was paid to him, a like monthly stipend being paid to five other members of the Council, to oppose the Central Traction bill.

"Subsequently, in the summer of 1898, long after the bill had been passed, he met the defendant in New York and there received from him $2,500, but not on account of the Central Traction bill.   He states that the defendant had promised to pay him the sum of $100,000 in connection with the traction bill and a bill for a gas ordinance, but denies that he ever agreed to vote for any bill, and denies that he ever received any money for voting for any bill."

Before defendant gave him the $2,500 at the Waldorf Hotel, New York, he handed him a letter to sign, which Uthoff copied in his own hand and signed and gave to defendant.   That letter is as follows:

"New York, December 7, 1898.
"Mr. R. M. Snyder, New York, N. Y.

"Dear Sir:—I am surprised at your talk of yesterday in which you stated that you had heard that I had said that while you did not offer me any money for supporting the Central Traction matter, I believe money was paid to other parties.   I suppose you are now satisfied that I never made any such remarks, but in the event it ever comes up again, and to further assure you in this matter, I desire to say this to you in writing, that from my acquaintance with you I believe you are as far above offering a bribe as I would be above receiving it.   I supported the bill because I thought the road would be a

benefit to the districts that needed it and because I thought you intended to promptly build it. I hope you will go to work soon and prove I was right.

"I am obliged to your invitation to dine with you, and go to the theater tonight, but I expect to leave the city on an early train.

"Yours respectfully,<br>"F. G. UTHOFF."

"Louis Dieckmann testifies that he saw defendant after the North and South bill had been vetoed and dropped, and was asked by him to assist in the passage of the Central Traction bill; that he arranged the interview between Uthoff and the defendant, but was not present in the room at the interview respecting the Central Traction bill testified to by Uthoff; that the next day he took a package to Uthoff, an envelope, which was sealed, and at the request of Uthoff, laid it down on the table or sofa. He did not know what the package contained and was not told by defendant. After this Uthoff told him he could not vote for the bill and wanted to see the defendant, and he went with Uthoff to the hotel, where they found the defendant, but Dieckmann was not present at the interview between the two."

"Geo. J. Kobusch testified that the defendant came to see him in 1898 and spoke of a railway franchise bill. Kobusch was interested in the bill and got defendant interested and met him a number of times with respect to it. The first one was the 'Second North and South bill,' being House Bill No. 282. Defendant told him at one time Uthoff wanted $50,000 for his vote, and told him once that he had paid Uthoff that amount for his vote. This statement was after the bill had been passed, and was made in New York City. Uthoff told the witness that he had returned $50,000 to the defendant. Witness does not know whether the defendant had charged him and the other promoters with the $50,000 as paid to Uthoff. Defendant told witness that he had paid Car-

roll, a member of the Council, $17,500 for his vote, and that Carroll was handling money for some of the other men, members of the Council, Mr. Brinkmeyer and Mr. Paulus Gast, who were to get $10,000 apiece. The witness sent $10,000 from Mr. Mepham to Mr. Gaus. He received the money from the defendant. He did not get the $10,000 which he sent to Gaus specifically from the defendant, but the defendant gave him thirty-five or forty thousand dollars, which he was to give to Mr. Mepham for his services, and Mepham paid Gaus. The members of the Council supporting the bill were to get $10,000 each. Defendant said that he had paid altogether two hundred or two hundred and fifty thousand dollars to pass the bill. Witness was then under indictment for perjury before the grand jury respecting his testimony before that body concerning these same transactions.''

''Edgar A. Mepham testified that he was employed by Mr. Kobusch to look up a route for the proposed street railway, and also to create a sentiment for the bill granting a franchise among the property owners, and that he secured the biggest petition for the measure that he had ever presented to the Municipal Assembly. He saw the defendant with reference to the Central Traction bill, and occasionally with reference to the second North and South bill. He might have had some talk with the defendant with reference to members of the Council and their votes. They were trying to create a sentiment favorable to the bill. He could not remember whether there was anything in these conversations with reference to the use of money or the 'fixing' of members of the Council, and he did not remember so testifying before the grand jury.''

''F. H. Marshall testified that when the second North and South bill was pending before the Municipal Assembly there was $145,000 deposited in the Continental National Bank, to be held by him, Marshall, as trustee, in escrow, to be paid out upon delivery to him of

a legally completed franchise known as House Bill No. 282 of the Municipal Assembly of St. Louis. This money was subsequently turned over to the defendant. This testimony was received over the objection of the defendant.

"On cross-examination, the witness testified that he lived in Kansas City from 1892 to 1895, and defendant then had a home in Kansas City, was a man of family and kept a house. That in 1898 he visited in Kansas City and went out to see Mr. Snyder to his house on Independence Avenue."

The State then offered evidence to sustain the charge in the indictment that since March 22, 1898, the defendant has not been an inhabitant of or usually resident within the State of Missouri, as follows:

"Alexander Konta testified that he was in New York City from the end of March, 1899, to April 10, 1900, stopping at the Waldorf-Astoria. He knows the defendant and saw him frequently at the Waldorf, and at a banker's office at times, and while in New York, the defendant lived at the Waldorf hotel. During the summer of 1899, the defendant went to Europe, sailing on the tenth of June and returning about the sixth of September. There were two days in the week that defendant was never in New York, but the remainder of the time witness believed he was usually there, but witness himself was not there all the time. Witness was away off and on for a few days, and on the twentieth of July, 1899, sailed for Europe, returning the second week of October, sailed for Europe again on the twenty-fourth of January, 1900, and returned on the seventh of March, 1900; sailed again on the tenth of April, 1900, and returned the nineteenth of April, 1902. With the exception of the time indicated when witness was in Europe, he was from March, 1899, to April, 1900, in New York city at the Waldorf hotel. Saw defendant there frequently. Defendant had rooms at the Waldorf by the

year, and had a desk in the bankers' or brokers' office of G. H. Bache & Co., in Wall street. Witness used to see defendant there quite often. Could not say that he saw the defendant daily during this period in New York, because the defendant was away a few days every week. The apartments that defendant had at the hotel were like any other apartments in the house. The defendant was absent from New York during that period about two or three days in the week, and witness was under the impression that the rest of the time he was in New York a great deal.

"So far as witness knows, the defendant was in New York on business as any man would be who was living in the West and still keeping his home in the West and going to see his family. Witness had business with defendant in New York and also in Europe in the summer of 1899. During his periodical absences from New York, the defendant frequently went to Boston, and was married there in January, 1900. Defendant brought his wife to the Waldorf in January, and they were there until the fifteenth or sixteenth of the month, and then they went on a trip. Witness knows not where. They returned later to the Waldorf.

"On cross-examination witness stated that during the period he was in New York his family was in St. Louis and his home was in St. Louis. He was in New York on business. He himself had taken rooms at the Waldorf by the year. It was a common custom for people who had a great deal of business in New York to so take rooms, because of the economy, a three month's discount on the year being allowed where they were so taken. His own business in New York was of a transitory nature, and he was there for the purpose of financing some matter in which he was engaged. A great many people from the West were in New York during that time. It was a period when a great many business enterprises were being promoted, and he saw a number of St. Louisans during that period in New York City on finan-

cial business, who were there quite as persistently as himself. Five months after he became acquainted with defendant, the defendant told him he had a home in Kansas City, and spoke of pictures in his home. A part of the time they were in New York, they were engaged in the same business, and it was upon this business that they went to Europe. Witness went as a mere sojourner, to attend to the business, and he believed the same was true of defendant, who went over at his request to assist in the business and came back when their business mission was over. Mr. TenBroek of St. Louis was in New York a great deal of the time and he had an office there, but his home was in St. Louis. The Waldorf is a very large hotel, accommodates a great many people, and it is a place where you can find almost anybody from any part of the United States.''

''G. H. TenBroek testified that he was in New York every month excepting January, 1900, from January 1, 1899, to and including July, 1900, but was not there continually. He was there on several matters of business and associated with him were Mr. Konta and Mr. Greenwood. He first met the defendant in March of 1899, and from that time until July, 1900, the defendant made his place of abode at the Waldorf-Astoria, except during the period that he was away from New York. He went abroad in June, 1899, and returned in September. Witness saw him repeatedly from March, and down town occasionally, but not often. When he saw him down town it was in the office of Bache & Co. The defendant had two rooms at the Waldorf. After his marriage the defendant was at the Waldorf, but whether his wife was with him he could not state. During the interval from March, '99, to July, 1900, he saw defendant repeatedly. Witness's stays in New York were from two weeks to three months. On some trips when he was there for two weeks, he might not have seen defendant at all. He can not state as to that. He simply met him at the Waldorf, and his impression

is that he met him repeatedly and frequently. He had correspondence with Mr. Snyder beginning June 26, 1900. Letters were addressed to Mr. Snyder at different places and answers were received from him sent from different places—New York, Kansas City, Sault Ste. Marie, Alexandria, Minn., and Toledo — most of them from Kansas City. Witness usually saw the defendant at the Waldorf.

"On cross-examination, witness testified that he lived in St. Louis and had all his life. St. Louis had always been his residence, and it was so during the year -1900. He is engaged in St. Louis in the practice of law, has an office there and also had an office in New York. Had frequent occasions to go to New York on business, returning to St. Louis when his business was done, residing always in St. Louis. During the year 1900 a great many people of his acquaintance living in the West were putting in a great deal of their time at the Waldorf. It was a period of active financial business, and, in a general way, the Waldorf was headquarters for people from the West who had financial business in New York. They gathered and met there in the evening in the corridors of the hotel. When he first met defendant his impression was that he was a New Yorker, but in the course of his acquaintance with him he learned that he was from Kansas City and had a home there, and that he went to Kansas City, but how frequently witness could not state, but he did during the year of 1899 go occasionally to Kansas City.

"Defendant was abroad with Konta during the summer of '99. Witness recollects distinctly that after defendant's return from Europe he went occasionally to Kansas City. Witness had then become more concerned to know the defendant's movements and whereabouts. He found that defendant had relations of some kind in Kansas City, and he learned definitely in July, 1900, that he was connected with a bank there. The business that witness had with defendant related princi-

pally to the bank in Kansas City, of which defendant was president. This was the City National Bank of Kansas City.

"Defendant had apartments by the year at the Waldorf. Witness did not have his apartments on those terms. He was at the hotel about two-thirds of the time during the period mentioned; does not know how long he had known the defendant before he learned that he was from Kansas City. The impression that he first had that defendant was a New Yorker was not gotten from anything that he said, but simply the impression of witness from the way defendant was living. Witness knows two other people besides defendant, one a gentleman from Massachusetts and another from Rhode Island, who engage rooms at the Waldorf by the year, and he knows also that Mr. Konta had rooms there by the year. It was a matter of economy, as it is subject to a discount of three months' rental."

"Moses Greenwood testified that in 1899 and 1900 he was for more than half the time in the city of New York. Stopped at the Waldorf hotel; knew the defendant, saw him frequently at the Waldorf mornings and evenings; had business with him in June, 1900. Defendant had a place of business in New York in Wall or Broad street. Witness was never there. Was never in defendant's rooms at the Waldorf. Was introduced to defendant in June, 1900. First saw him at the Waldorf between March and May, 1899.

"On cross-examination witness testified that he began stopping at the Waldorf in March of 1899, and continued there occasionally until September, 1900. Witness is a married man with a family, who reside in St. Louis. He made frequent trips to St. Louis during the period in question. Witness was in New York on transient business, which kept him longer than he expected. In March, '99, he saw defendant frequently. He was not thinking of the matter in any particular way, and could not say whether four or five days a week or six or

seven. He took no account of it. During this period witness himself was away from New York, returning to St. Louis five or six times. Was in New York two or three weeks at a time, sometimes eleven and twelve weeks. His impression was that the Waldorf was Mr. Snyder's headquarters, as it was that of the witness, of Mr. Konta and Mr. TenBroek. Witness had an office in New York, but simply for the purpose of exploiting the deal he was interested in. It was not permanent and he did not contemplate a permanent location on his part. He simply wished to be where he could interest financiers.''

''Shirley W. Johns testified that he was a reporter for the 'St. Louis Star' in March, 1898, and interviewed the defendant with respect to the franchise bill, and in the course of the interview defendant told him that while he had a residence in Kansas City, his home was in New York. It was quite a long interview. That was only one of a great many statements that defendant made. In interviews of this kind witness usually locates a man and asks him where he is from and where he lives. Could not state definitely whether he asked the defendant that question on this occasion or not. Witness's recollection is that he said that while he had a residence in Kansas City, his home was in New York.''

''John H. Aubeare testified that he was a reporter for the 'Globe' in March, 1898. Saw defendant on the eleventh day of that month with respect to the franchise bill. Had gone to the court house, gotten the record, and saw defendant's name among the incorporators of the company. Witness tried to connect him with Kansas City, and defendant tried to disabuse his mind, that he was not from Kansas City, but from New York, that his home was in New York, but he had business connections in Kansas City. The defendant did not say where he himself lived, except in New York, witness believes. The conversation did not deal with personal matters at all, it was only in relation to the business he went to see

him about. Witness sought to find out if it was not Kansas City parties interested with the defendant in the enterprise. Defendant told him no, that he had plenty of capital, and said it was eastern capital. Witness told defendant he had heard he was from Kansas City. Defendant said no, from New York. Witness had in mind identifying the people connected with the enterprise. Does not know whether defendant said that his 'home,' using that term, was in New York. Could not remember the words. Don't know whether defendant said he had a home in New York. He said that his money or capital, or some such expression as that, was in New York.''

''William Stone Woods testified that he lived in Kansas City, was president of the National Bank of Commerce of that city, and in the year 1900, spring of the year, defendant was in his office and they had a conversation about the City National Bank which was organizing. Defendant said that he was living in New York. Defendant was engaged in organizing the City National Bank, and Mr. Strain, who had been with the witness in his bank, had resigned his position to take a place in the bank defendant was organizing. Defendant came to his office and said that he had about made up his mind that he did not care to proceed with the organization of the City National Bank, but was under obligations to Mr. Strain, and if Woods would take him back there would not be any City National Bank. In that conversation defendant said he could not afford to come back to Kansas City to live. That his interests were east. This was early in 1900.

''On cross-examination, witness said that he had known defendant for some twenty years in Kansas City. Defendant had been engaged in banking in that city. Was at one time a director in the National Bank of Commerce. Later was running a small bank, the Mechanics' Bank, and that continued until it was absorbed by the City National. The Mechanics' was a State bank, and

defendant was president of that. When it was absorbed by the City National, defendant became president of that bank. Witness knows where defendant's home, house and residence was in Kansas City, and where it is today. It is on Independence avenue, one of the best avenues in Kansas City. Defendant lived with his family on Independence avenue for several years. Before that he lived on Troost or Forrest avenue, moving in 1897. Defendant was giving some excuse why he would not organize the City National Bank. He said that he could not afford to come back, that his interest was in New York. He did not say that he was stopping or living at the Waldorf-Astoria. Witness did not ask where he was living. He would know of defendant having a home in Kansas City as well as he would know of Major Warner's having one there, during all the years of 1897, '8, '9, clear down, and his understanding is that defendant's house has been running there all the time, with his family there, his children and his sister, and then his sister-in-law, after the death of defendant's wife, continued to keep house, until defendant married the second time, his children living there all the time. He was never at defendant's house in Kansas City since the defendant bought it.

"On redirect examination, witness stated that he saw very little of defendant for quite a while previous to his organizing the City National Bank, say for a year or more. He lived within eight or ten blocks of the defendant's home. Defendant had been engaged in organizing the City National Bank for about thirty days before he had this conversation with him. He did not see defendant as much as he did Major Warner. Major Warner he saw nearly every week. He is quite a jovial kind of fellow and comes around."

This was substantially all the evidence introduced by the State in chief.

The defendant offered a demurrer to the evidence, which the court overruled, and the defendant excepted.

On the part of the defendant, the evidence was as follows:

"R. A. Long testified that he was in the lumber business in Kansas City, his company being the Long-Bell Lumber Company.    He lives at 2814 Independence boulevard, next door to the defendant on the east.    He has known defendant for about eight years, in Kansas City.    Defendant has been engaged in the banking business principally, and he built the gas works in Kansas City.    He was president of the Mechanics' Bank and remained president until it was merged into the City National Bank, and was then president of that.    Defendant severed his connection with that bank six or eight months before the giving of witness's testimony.

"Witness saw defendant frequently in Kansas City during the years 1898, 1899, 1900, and 1901, mostly at his home and during those years the defendant lived at 2806 Independence avenue.    The house was occupied by Mr. Snyder and his family, a sister-in-law, Mrs. Richey, keeping house a part of the time, and, after defendant married, his wife was added to the household. During all those years the house was kept open like the witness's own and it was never left without either the servant or some member of the family in charge.    He saw the children going to and returning from school, and they visited at the house of the witness, as did Mrs. Richey and Mrs. Snyder since her marriage.    The defendant visited at the home of witness, and witness visited at the house of defendant.    Witness saw defendant going in and out of the house frequently during all those years.    Witness remembers a reception at the Snyder house on the return of Mr. and Mrs. Snyder to their home in Kansas City in January of 1900.

"On cross-examination he stated that he saw the defendant most frequently going in or coming out of the house, sometimes saw him down town.    Saw him once in New York at the Waldorf, which was in September, 1899.    Defendant never spoke to him about his intention

of living in New York, and he never had any conversation with defendant to that effect. Defendant was away from home some of the time, as was witness himself, who was away possibly a quarter of the time. He can not tell just when defendant was in Kansas City and when he was away, but he saw him frequently at his home in Kansas City."

"J. R. Dominick has lived in Kansas City for about sixteen years, and is in the banking business, being president of the Traders' Bank. He lives at 2724 Independence avenue, which is the first house west of the defendant's. He has lived there about three years, and when he moved there the defendant with his family occupied the house next to the east. The family of defendant was composed of his sister-in-law and two or three children. Witness moved to the place on Independence avenue in October, 1899, and from that time to the present the house next to him on the east has been occupied by the defendant and his family. The only change that has taken place in the occupancy of the house is that the defendant has married and his wife has come in. Witness has known the defendant about fifteen years, and during that time he has been engaged principally in the banking business. He knew him first in connection with the National Bank of Commerce, of which the defendant was a director. Then he was with the Mechanics' Bank, or Mechanics' Savings Bank, and when that was merged with the City National the defendant became president of the City National Bank. During the years 1898, 1899, 1900, 1901, and 1902, he has seen defendant frequently in Kansas City around the business portions of the city, in the principal places, mostly in banks, and has seen him going to and from his place of residence and passed him upon the streets of Kansas City; has seen him about his home, and the defendant's house during the years named has always been occupied in the usual way of a residence, as the witness's own house or any

other house on the boulevard was occupied, and it was so occupied by the defendant, his family and servants.

"On cross-examination, he said that the house was kept by Mrs. Richey, a sister-in-law of the defendant, and there were three children there, two small ones and one older one. He knew that it was the defendant's residence and that all of his family lived there; that defendant owned the house. He doesn't remember of seeing the defendant in New York City. He can not tell as to specific months in 1900 whether he saw defendant or not, can not fix particular dates, but saw the defendant frequently during that period."

"Churchill J. White is seventy-seven years old and has lived in Kansas City thirty-seven years, and for thirty years was in the banking business; was connected with different banks there, and among others, the National Bank of Commerce at Kansas City. Was the cashier of this bank for about twenty-eight years; has lived in Missouri sixty-five years; knows the defendant, and has known him for about twenty-five years; has known him at Kansas City and knew him at no other place. The defendant has lived in Kansas City during the last fifteen or twenty years; lives there now. During the last eight or ten years the defendant has been connected with the Mechanics' Bank and the Citizens National Bank of Kansas City, and was a director of the National Bank of Commerce during the time witness was cashier. When the Mechanics' Bank was merged into the City National, the defendant become president of it and remained in that position until about six months before the time of witness's testifying. Witness saw the defendant in the business portion of Kansas City during the years 1898, 1899, 1900, 1901 and 1902 frequently, and had some business transactions with the Mechanics' Bank, and frequently saw defendant there during the years 1898 and 1899, and after the merger with the City National Bank, saw him there. He knows where the defendant lives in Kansas City. Has been at his home on

Independence boulevard, near the corner of Ann street; was at his home about two years before; found him there at one time; found his housekeeper and children there at another time. Mrs. Richey was then house-keeper. He has seen the defendant in his home and go-ing to and from his home frequently during the last five or six years. Knew where defendant lived before he moved to Independence boulevard. During the years that have been mentioned he saw him frequently at his place of business; witness does not go down town a great deal, but he would almost always see him when he did go down. Witness is old and doesn't bother business people. He lives four or five blocks from the defendant and passes there frequently when taking a drive, and has seen the defendant sitting out on his porch fre-quently, and has seen his family there most all of the time, and the house during all these years had been occu-pied all of the time. Defendant moved to Independence boulevard in the fall of 1897. His home there is a very elegant one, house is constructed of brick and is quite a large one, worth probably, house and ground, $50,000. The defendant's home and Mr. Long's make the entire block in that place. The house has been kept up elegantly during the years 1898, 1899, 1900 and 1901. There have always been three or four servants there. The defendant owns horses and family vehicles. There has been no change in the occupation of the house since the defend-ant and his family moved there in the fall of 1897 down to the present time. The defendant and his children have been there occupying the house all of this time. Mrs. Richey remained there until defendant married in January, 1900, and a while after, and then Mrs. Snyder came, and she has remained there in charge of the house since that time. The defendant was a widower when he moved there.

"On cross-examination, he stated that he knew Mrs. Snyder remained in charge of the house because he would see her frequently when he was taking a ride;

see her walking about the yard, in the door or on the porch. This is true both of Mrs. Snyder and Mrs. Rich- ey. He saw them both in this way, he would not say every day, because on bad days he would not be likely to take a ride. Mrs. Snyder came there directly after she married, which must have been about two years ago. He cannot state specifically as to the dates of seeing the defendant or Mrs. Snyder. He knows that the defend- ant was at a reception given by the niece of witness at one time, but he can not tell just when that was, but it was after the defendant's marriage, and he thinks it was in the fall of 1900. In the winter the witness goes to California and stays about four months each time. He went to California in 1898, to Florida in 1899, to Old Mexico and California in 1900. In 1901 he didn't go anywhere. He was not in the habit of going away in the summer, but in 1901 he was gone for about ten days, and in 1898 about two weeks. He is satisfied that he saw the defendant in Kansas City in the summer of '99 and 1900; can not say that he saw him in August, but he would meet him repeatedly and see him go by witness's house. The recollection of witness is not as good as to dates as it used to be.''

''R. L. Yeager has lived in Kansas City for thirty- five years. He is a lawyer by profession, knows the de- fendant, and has known him for something more than than twenty years; knew him during these years at Kan- sas City, and knew him nowhere else. During all this time defendant has lived in Kansas City and witness has never heard of any other place of his residence. Saw the defendant often during the years of 1898, 1899, 1900 and 1901 in Kansas City, at the defendant's home, at the home of witness, on the street cars and at his place of business in Kansas City. Saw him at the Mechanics' Bank and at the City National Bank. When defendant was in Kansas City witness would see him. Would see him every day for the reason that the Mechanics' Bank was in what was called the New York Life Building and

the office of the witness was in the building, and witness on going to his lunch right by the Mechanics' Bank saw him pretty nearly every day when he was there; saw him frequently indeed in that way at the Mechanics' Bank. Witness does not remember the various instances he was seen there at the bank. If he was in town he would see him, and very often he would see defendant in the office of witness. After the merger of the Mechanics' Bank with the City National in 1900 he saw defendant in the City National Bank, but not so often as at the Mechanics' Bank, but a number of times he would go there and stop in and talk to him a few minutes. He had a good deal of business with the defendant; represented him as attorney for the four years mentioned, in some matters, and in other matters he had business with him. Defendant was engaged largely outside of the banking business in brokerage, making large loans for a number of eastern money concerns, and the witness's clients would make loans and witness would pass on the titles, and he would meet defendant in that way, but to specify dates and times he could not do it. He had visited the defendant at his home on Independence avenue; found the defendant there sometimes, sometimes his sister-in-law; the three boys; saw the boys frequently as they passed on the cars. He attended the reception at the time of defendant's marriage when he brought his wife home in January or February of 1900. The wife of witness assisted in receiving the guests. Witness went with his wife to Snyder's home after that, and was there several times himself and his wife was there at other times. Witness and his wife went there to make their party call, they found defendant and his wife and the children and family. Witness called once or twice, once defendant was there and once not. He found Mr. Snyder and Mrs. Richey there. Defendant kept a telephone in his residence and witness has called him up a number of times and talked with him over the telephone. Witness was president of the school

board of Kansas City for nineteen years; has been county attorney and assistant to Major Warner as United States district attorney, and also has been prosecuting attorney and city counselor. In a general way he has knowledge of defendant's personal presence in Kansas City during the years, 1898, 1899, 1900, and 1901. He is not able to fix particular dates, except the occasion of the marriage reception, and the time when defendant was organizing the City National Bank, as he asked witness to take some stock. During the years in question he saw defendant frequently. He was for defendant in some matters and against him in some. Examined quite a number of titles for him, had litigation for him, had some against him, had consultations, advice and things of that kind; general practice; he didn't consider the defendant a regular client, but when he wanted business done he came to witness and got it, and during this business intercourse he never had occasion to address the defendant or see him at any other place than Kansas City.

"On cross-examination, witness testified that he had no occasion to address the defendant elsewhere than at Kansas City, for he had an office in Kansas City and witness would go to the office and talk to his brother or manager if defendant was not there, and if they wanted to reach him when he was away, they would reach him by wire. That was in regard to making releases of deeds of trust. He has been an attorney for defendant more or less for the last ten or fifteen years. Specific dates of seeing and meeting the defendant he can not mention, but during the years in question he saw defendant probably once every month or two in that time, and sometimes oftener than that. Sometimes less. The defendant took a trip to Europe, witness saw him just before he went. This was in 1899. Defendant was gone somewhere about two or three months. He was in Kansas City and witness had some personal matters; witness saw him and defendant told him he was going to Europe.

Never communicated with defendant at the Waldorf; never saw him there. In 1900 or 1901 defendant wanted him to go on a fishing excursion with him. These are three special times of meeting that he recalls. He could make it fifty, but can not give the dates.''

The defendant also offered George Holmes, the city assessor of Kansas City, and identified by him the assessment lists of 1898, 1899, 1900 and 1901 of the defendant and signed by defendant and sworn to by him.

J. W. McCurdy, the collector of Kansas City from 1895 to March, 1899, identified the tax receipts of defendant for personal property taxes paid by defendant in the years 1898, 1899, and 1900, each of which showed defendant's residence to be on Independence avenue in Kansas City, Missouri.

Fred C. Adams, tax collector of Jackson county for the years 1901 and 1902, identified personal tax receipts paid in January, 1902 and showing defendant's residence on said Independence avenue.

F. A. Snider, deputy treasurer of Kansas City during the years 1898 and 1899, testified he was not related to defendant. He identified tax receipts paid by defendant for 1899 in said city on his residence at 2806 Independence avenue.

John J. Green, was city treasurer in the years 1897 and 1898 of Kansas City, and he identified tax receipts for his taxes paid by defendant for 1897 in which defendant's address is given as 2600 Forrest avenue, and in 1898 as 2806 Independence avenue.

R. M. Thornton, during 1899 and 1900, was a notary public in Kansas City, Missouri. He identified the incorporation papers organizing the City National Bank of Kansas City, Missouri, which were introduced in evidence and which were executed January 29, 1900, and showing the names of the directors, their places of residence and number of shares of stock held by them. The name of defendant heads the list and his place of residence given as Kansas City, Missouri.

The oath of the directors of the City National Bank required by the statutes of the United States, was offered, showing that defendant and all of said directors, except one, who was given as residing at Topeka, Kansas, swore they were citizens of the United States and residents of Missouri.

The record of the incorporation of the Central Traction Company executed in March, 1898, shows that the defendant was one of the shareholders and his residence in Kansas City, Missouri.

Twenty-five other witnesses, residents of Kansas City, among them, bankers, school teachers, merchants, mail carriers, night watchmen, the wife of defendant and his sister-in-law who kept his house at 2806 Independence avenue, Kansas City, after his wife died until his marriage, January 1, 1900, his butcher, and others who knew him intimately, all testified that during all the years, 1898, 1899, 1900, 1901 and 1902, the defendant was a resident of Kansas City; kept his home and children there and with the exception of a trip to Europe in 1900 for three months, was constantly in the city and manager of the City National Bank, and prior to its organization, of the Mechanics' Bank, which was merged into the City National Bank. The instructions will be discussed in the course of the opinion.

I.

The indictment is assailed in regard to the charge that "since the twenty-second day of March, 1898, the said Robert M. Snyder has not been an inhabitant of or usually resident within the State of Missouri." It is insisted this is a statement of a mere legal conclusion, and it is indefinite and uncertain whether the defendant is charged with not being an "inhabitant" of the State of Missouri during that time, or is charged with not being "usually resident within the State" during that period.

Before entering upon a discussion as to whether the two clauses "inhabitant of" and "usually resident

within'' are synonyms or antonyms, and whether they should have been charged conjunctively or disjunctively, it ought first to be determined whether it was necessary for the State to plead either or both. Was the State called upon to negative the bar of the statute of limitations? The general rule is that when an exception is so engrafted in the enacting clause of a statute that the offense can not be described without meeting and negativing the exception it must be set out in the indictment, but where such exceptions or provisos appear in distinct or subsequent clauses from that in which the offense is declared and denounced it is not necessary to negative such exceptions and provisos. This is the settled law of Missouri. [State v. Shiflett, 20 Mo. l. c. 417; State v. Bockstruck, 136 Mo. 351, and cases cited; State v. O'Gorman, 68 Mo. 179.] Now the statute of limitations relied on in this case, Revised Statutes 1899, sec. 2419, is clearly no part of the statute defining bribery, and in a number of the States and by the Supreme Court of the United States it is held that no sound rule of pleading requires the prosecuting officer to anticipate the defense and negative it by setting forth facts which avoid the statute. [State v. Gill, 33 Ark. 129; Thompson v. State, 54 Miss. 740; United States v. Cook, 17 Wall. l. c. 178.]

On the other hand it has been ruled in many States that the prosecutor should allege the true date of the commission of the offense, and then set forth the facts which avoid the bar of the statute of limitations as an excuse for not having preferred the indictment sooner, and this was announced by this court as the better rule in State v. Meyers, 68 Mo. 266, and by the Supreme Court of Pennsylvania in Blackman v. Com., 124 Pa. St. 578; Wharton's Cr. Pl. and Pr. (9 Ed.), sec. 318, and cases cited in note 2. Accepting, then, the law as ruled in State v. Meyers, 68 Mo. 266, the circuit attorney should have pleaded the exceptions which were necessary to remove the bar of the statute of limitations, and

we are brought to a consideration of whether said exceptions *were properly* pleaded.

Sec. 2421, Revised Statutes 1899, is one of the oldest statutes in the State. As originally enacted it first appears in the first volume of Territorial Laws of 1808, p. 218, sec. 40, and the Statutes of 1825, p. 323, sec. 41. The section then only included *fugitives from justice.* As it now appears, it is first found in the revision of 1835, p. 502, sec. 26. It was held in State v. Washburn, 48 Mo. 240, that it embodies *two alternatives,* either of which will be a bar to the limitations of three years found in section 2419. The first clause relates only to one who shall flee from justice, and it was held in State v. Harvell, 89 Mo. 588, that under this clause it was not necessary that he should leave the State to be regarded as a fugitive from justice. If he conceal himself upon his own premises so as to evade punishment, he is as much a fugitive as if he escapes to Canada. Under the second clause, the time during which any defendant is not an inhabitant of or *usually* resident within this State is not to be counted as a part of the limitation in his favor. In this case it is apparent that defendant was not a fugitive from justice. It is not so alleged in the indictment and the State's evidence shows he was not. Considering then only the second alternative alleged in the indictment "that from March 22, 1898, the defendant has not been an inhabitant of or usually resident within this State," must a distinction be made between "an inhabitant of" and one "usually resident within this State?" Are the two expressions used by the Legislature to describe one and the same status, or are they to be held to refer to different conditions.

An extended philological discussion has been indulged by counsel for the State to demonstrate the two phrases have a distinct signification—but reduced to a last analysis, the conclusion reached by COLERIDGE, J., in Rex v. Mashiter, 6 Adolphus & Ellis 153, is the one to which we must come, when he said: "Any lawyer

who was asked the interpretation of the word 'inhab-
itants,' would say, 'I must see where it is used, for, by
itself, it has no definite meaning.' If its signification
varies we must resort to the context for explanation.''

We are cited to various decisions upon statutes
affecting taxation and the administration of estates in
which the words ''inhabitants'' and ''residents'' are dif-
ferentiated from ''domicile,'' and from each other, but
none of these cases present the two words in such con-
text as they appear in the section under construction.
It may be that ''inhabitant'' is often a more compre-
hensive term than *resident*, but taken together as they
appear in the clause under consideration, with the mod-
ifier, *''usually,''* before the word ''resident,'' it seems
to us that the term *''usually resident''* following the
word ''inhabitant'' in such close immediate connection
was intended to illustrate the meaning of ''inhabitant,''
and that whatever shades of distinction may be drawn
when the words are used independently of each other,
in other statutes, here they are synonymous.

A person who is an inhabitant of a city, county or
state is *''usually resident''* therein, and one who is
''usually resident'' in a place is ordinarily deemed an
inhabitant of such place. The fact that the two phrases
are connected by the conjunctive ''or'' is of little sig-
nificance, because ''or'' is often used to connect alterna-
tives and synonyms, thus ''co-ordinating two or more
words or clauses, each of which in turn is regarded as
the equivalent of the other or others.'' ''Thus we say of
a particular diagram that it is a square, *or* a figure with
four equal sides and angles.'' [Century Dictionary.]
Of a man, that he is of the Caucasian or white race.
The Century Dictionary defines the noun ''inhabitant''
as ''a resident, one who dwells in a place as distin-
guished from a transient or occasional lodger or
visitor.'' Our laws for the construction of statutes de-
fines residence as, ''that place where the family of any
person shall permanently reside in this State, and the

place where any person having no family shall generally lodge, shall be deemed the place of residence of such person or persons respectively.'' [R. S. 1899, sec. 4160, clause 17.]

In Kennedy v. Ryall, 67 N. Y. 386, the Court of Appeals said: ''Generally speaking, domicile and residence mean the same thing. And an *inhabitant* is defined to be one who has his domicile in a place, or a *fixed residence* there.'' [Crawford v. Wilson, 4 Barb. 520.] We are commanded by our statute for the interpretation of laws to give words their ordinary and usual meaning, and as already said, while lexicographers may draw shades of distinction between these two expressions ''inhabitant of'' and ''usually resident within,'' the two are usually classed as synonymous. [Thorndike v. Boston, 42 Mass. 242; School Dist. v. Pollard, 55 N. H. 504.] In view of the variety of statutes in which the words inhabitant and resident are used it is impossible to restrict either word to one meaning.

Perhaps no better definition of inhabitant will be found than that given by the Supreme Court of Massachusetts in Lyman v. Fiske, 17 Pick. 234 (28 Amer. Dec. 293):

''In general terms one may be designated as an *inhabitant* of that place which constitutes the principal seat of his residence, of his business pursuits, connections, attachments, and his political and municipal relation. It is manifest, therefore, that it embraces the fact of residence at a place, with the intent to regard it and make it his home.'' [Matter of Wrigley, 4 Wend. 605; Spragins v. Houghton, 3 Ill. 396.]

In 24 Am. and Eng. Ency. of Law (2 Ed.), p. 694, resident is defined as one whose place of abode is in a given place, ''who has no present intention of removing therefrom.'' Judge COOLEY in his Constitutional Limitations (7 Ed.), pp. 903 and 904, says, ''A person's residence is the place of his domicile, or the place where his habitation is fixed without any present intention of

removing therefrom.  The word 'inhabitant,' 'citizen,' and 'resident,' as employed in different constitutions to define the qualifications of electors, mean substantially the same thing; and one is an inhabitant, resident, or citizen at the place where he has his domicile or home.'' In many cases the words inhabitant and resident are held to be synonymous when used with reference to statutes of limitation and place of service of process, as they are evidently used in the statute under consideration.

In Brown v. Boulden, 18 Tex. 433, the court said, ''The statute also uses the word inhabitant.  An inhabitant and resident mean the same thing.'' [Burrill, L. Dict., tit. ''Inhabitant;'' Munroe v. Williams, 37 So. Car. 85 and 86; Drake on Attach. (7 Ed.), 58 and 59; Hinds v. Hinds, 1 Iowa 36-43 and 44.]

In McCormick v. Board of Commrs., 68 Ind. 217, it is said inhabitant is the nearest synonym to ''resident'' in the English language.  In Bicycle Stepladder Co. v. Gordon, 57 Fed. 529, the question of whether a defendant in a suit in the Federal court was an inhabitant within the meaning of the act of Congress arose and the court, basing its opinion upon Shaw v. Mining Co., 145 U. S. 444, said, ''The Supreme Court of the United States in effect construes the word 'inhabitant' to be, within the meaning of the act, synonymous with 'resident.' '' [See, also, King v. Bishop of Rochester, 12 East 353.]  When to the noun ''resident'' the adjective ''usual'' is prefixed in the sense of ''customary'' or ''common,'' the term becomes more clearly the synonym of inhabitant as that word is defined by the courts.  Our conclusion is that the two phrases are synonymous and equivalents of each other in this statute.

It follows that by charging that ''the defendant, since the said twenty-second day of March, 1898, has not been an inhabitant of or usually resident within the State of Missouri'' the indictment sufficiently alleged facts which, if true, would remove the bar of the statute

of limitations otherwise apparent on the face of the indictment, and it was not necessary to allege only one of the two, nor *both conjunctively,* since taken together as averred, they are one and the same. [Rosenberger v. Com., 118 Pa. St. 77.]

The learned circuit court took a different view, and instructed the jury that they had nothing whatever to do with the question of whether the defendant during the said period was ''an inhabitant of'' this State, and instructed them that if after deducting from the time which had elapsed between the commission by the defendant of the crime of bribery, or attempted bribery, and the finding of the indictment on April 5, 1902, such parts of said time as they might find from the evidence *the defendant was not usually resident within the State,* less than three years remained, the prosecution was not barred.

## II.

The next insistence relates to the demand of the defendant that he should have first had a separate trial on his special plea of the statute of limitations without pleading further. The circuit court denied this and directed a plea of not guilty to be entered. There can be no cavil that the defendant was entitled to have the facts contained in his special plea tried by the jury, nor that his evidence to sustain the same was in fact submitted to the jury. The question here presented is as to the manner and order in which that plea was presented to the jury. It was unnecessary for defendant to plead the statute of limitation in order to allow him the benefit of it. It is now generally conceded that the statute may be taken advantage of on the general issues. [Wharton, Cr. Pl. and Pr., 317, and cases cited.] The indictment itself tendered that issue, and the plea of not guilty was a sufficient traverse, and embraced the general issue. We have before considered the trial of special pleas in-

terposed by a defendant charged with crime, and reached the conclusion that there is no authority in this Sate for impaneling two juries to try one indictment. The court and one jury are competent and required to try all questions between the State and defendant as to the charge in the indictment and all defenses which the defendant may have. In State v. Manning, 168 Mo. 418, there was a special plea of former jeopardy, and it was there insisted, as here, that the plea of not guilty and the special plea of *autrefois acquit* could not be tried by the same jury, but to that insistence we answered: ''As to the proposition that the plea of not guilty and special plea in bar could not be tried by the same jury, the authorities cited do not sustain defendant's contention. In State v. Huffman, 136 Mo. 58, it was only ruled that as there is no statute in this State, as in others, authorizing the trial of such special pleas under the plea of not guilty, they must be specially pleaded, but it was not held that the same jury could not pass upon both pleas. Both in that case and the subsequent case of State v. Wiseback, 139 Mo. 214, the error which this court condemned was the failure of the court to permit the jury to pass upon the fact of acquittal or conviction upon the same offense upon a former trial, the question in each being one of fact." And to the same effect was State v. Laughlin, 168 Mo. 415.

The accused may avail himself of the statute of limitations by special plea, but this will not necessitate a separate preliminary trial of such plea.

The decision in State v. Wear, 145 Mo. 162, does not affect the question. The question there was whether the special plea was sufficiently pleaded on its face and was sustained by the record, which was a question for the court, and not the jury. The cases of U. S. v. Norton, 91 U. S. 566, and People v. Roe, 5 Parker's Crim. Rep. 231, were determined upon demurrer. The other cases merely hold that a defendant must either plead the statute specially or give it in evidence and can not

avail himself of it by motion in arrest the first time. [State v. Thrasher, 7 Atl. 814; U. S. v. White, 28 Fed. Cases 1. c. 568.] The only difference of opinion is whether the special plea should not first be determined; not whether the same jury may not try both the special plea and the plea of not guilty, and on this point both Bishop and Wharton incline to the view that the special plea should be first tried.

In California, in People v. Helbing, 59 Cal. 567, the plea of not guilty and former acquittal were pleaded together, and it was ruled the verdict should respond to both, but there was no suggestion that it was improper to plead both, or that there must be a separate trial of each.

In State v. Ward, 49 Conn. 429, the defendant tendered his plea of not guilty and a plea of the statute of limitations, and on objection by attorney for the State that it was double pleading, the court rejected the plea, and directed the defendant to plead guilty, or not guilty, and he pleaded orally "not guilty." He was allowed to prove under his oral plea all the facts stated in his plea of the statute of limitations. Held no error. No error then was committed in declining to permit the defendant to have a separate trial on the issue of the statute of limitations alone. The court properly directed the plea of not guilty to be filed, reserving to defendant all his rights to be heard on his special plea of the statute.

## III.

Another error assigned was the refusal of the court to sustain the challenge to the juror Anderson.

As will appear from the statement, after this juror and the others had been duly tested on their *voir dire*, and this juror with eleven others had been found competent and accepted by both sides, and they had been sworn to try the case and the circuit attorney had made

his opening statement, this juror inquired of the court what he was to pass on, "merely the guilt or innocence of the defendant?" and when answered by the court in the affirmative, said, "And we have nothing whatever to do with the penalty to be imposed?" To which the court responded, "You will get your instructions when the case is closed," to which this juror said, "The only reason is, I have expressed an opinion on this line." Whereupon the court told him he did not care to hear further from him; that he would get his instructions on the law. Nothing further transpired then. The cause proceeded and two witnesses had testified and a third had been called and partially examined when a special challenge in writing was made to this juror.

It will be observed that the juror had not disclosed that he had formed or expressed an opinion as to the guilt or innocence of defendant, but apparently had expressed some views on the question of punishment. What they were he was not allowed to state. Counsel for defendant did not request to examine him on that point, and did not at the time challenge him, but permitted the cause to proceed as above stated. If for no other reason we think the challenge came too late, but the fact that the juror had special notions as to his duty in fixing the punishment did not affect his competency. The court properly told him he would get his instructions as to the law from the court on that point, and he acquiesced in that decision. What his views were we do not know, but the record discloses he agreed with his fellows as to the amount of punishment. We do not think the juror disclosed anything which rendered him incompetent, and we can discover nothing in the colloquy which can be said to be prejudicial to the defendant.

## IV.

The vital question presented on this appeal is whether the defendant had a fair trial on his plea of the

statute of limitations.   Sec. 2419, Revised Statutes 1899,
provided: "No person shall be tried, prosecuted or
punished for any felony, other than as specified in the
next preceding section, unless an indictment for such
offense be found within three years after the commis-
sion of the offense." The preceding section applies only
to offenses punished by death or imprisonment for life.
The offense for which this defendant is prosecuted falls
within section 2419 and the three years bar applies.   It
is well to note that section 2419 proceeds on the theory
that the accused is *guilty* of the crime, but after the lapse
of three years, he shall not be tried, prosecuted or pun-
ished for it, unless an indictment is found against him
within the three years.

In the consideration of this question it is to be
further observed that the indictment in this case on its
face disclosed that the offense was committed on March
22, 1898, and the indictment was found April 5, 1902,
and that four years and fourteen days had elapsed be-
tween the commission of the offense and the finding of
the indictment.   To avoid this bar of the statute, how-
ever, the indictment alleges that from the time of the
commission of the offense the defendant was not "an
inhabitant of or usually resident within this State."
The State under these circumstances assumed and was
required to show the facts which deprived the defendant
of the benefit of the bar of the statute which otherwise
stood confessed on the record.   If, as contended by the
State, "inhabitant of" is essentially different from being
"usually resident within" the State, it is clear as a
matter of pleading that the indictment would be uncer-
tain in that it failed to charge the specific ground upon
which it sought to avoid the bar.   The defendant would
not be advised whether the State would attempt to show
he was not "an inhabitant of the State," or whether it
would offer to prove he was not "usually resident within
the State;" in a word, the indictment would not advise
him upon which alternative the State intended to rely.

Our learned brother on the circuit construed the phrases "inhabitant of" and "usually resident within the State" to apply to *two distinct conditions,* and decided to submit to the jury only the alternative that the defendant had not been "usually resident within the State," thereby in effect conceding that the State had not offered any substantial evidence tending to prove defendant was not an inhabitant of the State during all that period, or that the evidence clearly established he was an inhabitant of the State during all of the three years, and gave the following instructions to the jury:

"3.   Under the statute of limitations in this State, the prosecution for the offense of bribery or attempted bribery must be commenced by the finding of an indictment for such offense within three years from the commission of such offense; the indictment in this case was found April 5, 1902. In determining whether or not three years have elapsed between the commission of an offense and the finding of an indictment therefor such time as the defendant shall not have been an inhabitant or usually resident within this State shall not constitute any part of such period of three years.

*"The question of whether or not the defendant in this case has been an 'inhabitant' of this State is not for your consideration.*

"If after deducting from the time which the jury finds and believes from the evidence has elapsed between the commission by defendant of the offense of bribery, or attempted bribery, if they find and believe from the evidence under the other instruction given (Nos. 1 and 2) that either offense was committed by defendant, and the finding of the indictment, April 5, 1902, such parts of said time, if any, as the jury may find and believe from the evidence and under the other instructions given (No. 4) the defendant was not usually resident within this State, less than three years remains, then the prosecution of this case under this indictment is not barred by the statute of limitations."

If the court was satisfied that the evidence established that the defendant was an inhabitant of this State, instead of telling the jury that fact was not for their consideration, it should have plainly instructed them there was no evidence tending to show he had not been an inhabitant of this State from March 22, 1898, to April 5, 1902, and, therefore, they could not deprive him of the benefit of the statute on the ground that he had not been an inhabitant of the State during said period.

That issue was tendered in the indictment and traversed by the plea of defendant, and there was an immense amount of evidence introduced on that point, and if the court was of the opinion that the defendant was an inhabitant of the State, the defendant was entitled to have that issue disposed of by a proper instruction.

If the court was satisfied that defendant was an inhabitant of the State, it was material because the court evidently held that in addition to being an inhabitant, the defendant must also be "usually resident" therein, and it was obviously necessary for the court to so define these terms to the jury as to enable the jury to determine whether in addition to being an inhabitant of the State the defendant was or was not usually resident therein.    But the court instructed the jury they had nothing whatever to do with the question of habitation. In this connection we must consider the fourth instruction which was as follows:

"4.    If from the evidence you find and believe that the defendant after the commission of the offense charged in the indictment, or of attempted bribery (if you find that either offense was committed by him) went to the city of New York and there engaged in business, and there had a permanent office and place of business, and there occupied apartments before and after his marriage, which were engaged by the year, having them as an established abode in New York, then you may find from such facts that during the period of time he was

so in New York he was not usually resident within the State of Missouri, *although you may also believe and find from the evidence that he had a home in Kansas City where his children resided and to which he occasionally returned; and in this connection you may consider any statements or declarations of defendant as to his place of residence which may have been proven in evidence.*

"If on the other hand you find that he maintained his home and family, and did business, in Kansas City, Missouri, and his visits to or stay in New York, whether for business or pleasure, were merely transitory or temporary, and that during all of the time of his visits there he kept and maintained his home and family and place of business, in Kansas City, and that his absence at any time or times from Kansas City was only temporary or casual in the carrying on or furthering or projecting business interests, requiring his presence elsewhere, then no such absence would justify you in finding that while it continued he was not usually resident within this State, and you will acquit the defendant."

Thus while the court instructed the jury it had nothing to do with the question whether the defendant was or was not an inhabitant of this State in its said third instruction, in its fourth instruction it in effect told them that although he was an inhabitant of Missouri and had a home in Kansas City, this was of no significance in finding whether he was usually resident therein. Can it be possible that any jury or court can intelligently determine the usual residence of any man without taking into consideration the place where his home is situated, and where his family resides? Certainly the circuit court did not think so when it gave its fourth instruction because it distinguished *between the home in which defendant's children resided* and to which he occasionally returned, and his "usual residence."

A definition of residence from which all of the elements of home and habitation are excluded as a matter

of no consideration is beyond the ordinary conception
and must have, in our opinion, confused the jury.  For-
bidden to inquire as to whether defendant was an inhab-
itant of this State, how could the jury consider those
elements which are confessedly common to both inhab-
itancy and residence?  The idea of inhabitant is neces-
sarily involved in usual residence.  Counsel for the
State cite us to the Century Dictionary for a definition
of "inhabitant."  It is "a resident, one who dwells in
a place as distinguished from a transient or occasional
lodger."  "Resident" is one having a seat or dwelling,
having an abode in a place for a continuance of time.
Obviously the word inhabitant as thus defined is the
larger and more comprehensive term, and if, as the cir-
cuit court seems to have concluded, defendant was an
inhabitant of Kansas City, under the foregoing defini-
tion he was necessarily a resident who dwelt in said city,
as distinguished from a mere transient or occasional
lodger there.  The effort to distinguish "usual resi-
dent" from "an inhabitant" within the meaning of sec-
tion 2421 became confused, from the fact that in contem-
plation of law there was no such distinction, and because
the two terms were and are synonymous and used to
illustrate one and the same status.  The difficulty was
inherent and could not be overcome to the comprehen-
sion of the ordinary intellect.  It is apparent that the
two instructions taken together were calculated to con-
fuse and mislead the jury and therefore erroneous.  The
jury had and could have no idea of what "usual resi-
dence" meant when required to disregard the elements
so necessarily associated with it, that of home and habi-
tation.

We are confirmed in our construction of section
2421, Revised Statutes 1899, by the interpretation given
this statute in State v. Washburn, 48 Mo. 240, by Judge
WAGNER, in which this court held that this section
embodies *two*, not *three* alternatives.  The first of which
refers to an accused "who shall flee from justice," and

the second includes as the other alternative an accused "who shall not have been an inhabitant of or usually resident within the State." This same statute has been the law of Pennsylvania for many years. In Graham v. Commonwealth, 51 Pa. St. 255, it came before the Supreme Court of that State for construction. In that case the defendant committed the offense in 1862 in Indiana county in said State, and remained in the county several months, after which he enlisted in the army of the United States. He returned home several times on furlough, and once as a paroled prisoner. He was discharged in 1865 and returned to his home in said county. The indictment was found in 1864, more than two years after the commission of the offense. In that State two years is the limitation. The court said:

"The only question we have to deal with is, whether the facts found do or do not establish that the defendant Graham was an inhabitant and usually a resident of the State, during the two years after the commission of the offense. His residence at the time" (of the commission of the offense) "was in Indiana county, where he remained for several months after committing the offense charged, until he entered the service of the United States as a soldier. He served in Maryland and Virginia, and returned home to his family several times, and remained for considerable periods, once as a paroled prisoner, and at other times on furlough, and when eventually discharged in June, 1865, returned to his family and residence at his home in Indiana county." The court throughout its opinion treated the phrases "an inhabitant of the State" or "usual resident therein" as synonymous, and said: "We think all the time he was in the service his absence was temporary and that he remained 'an inhabitant of the State or usual resident therein,' so that there was not the least obstacle in the way of instituting a prosecution against him, or even in claiming him to answer. His usual residence was not changed by the fact that he obeyed the call of

the President, and volunteered to fight for his country at her command.'' Further on, the court says, '' 'Usual' residence means 'customary,' 'common.' If the offender's customary residence is in the State during the two years, this is all the act requires. That it was in this case the facts found show. . . . If we were to yield to the construction contended for, namely, that a man is not an inhabitant of the State, and can not be usually a resident of it, who is not within it all the time during the two years, we would in effect repeal the limitation as it regards many persons, who, residing near the borders of the State, or whose business requires it, are out of the State numerous times within every two years. In such cases they would be forever liable, unless they tarried some time or other, during two whole years in the State. The proviso does not apply to such cases.'' Accordingly the sentence was reversed.

In Michigan the words of the statute are ''usually and publicly a resident within the State.'' In People v. McCausey, 65 Mich. 72, those words came before the Supreme Court for construction, and they said:

''It appears that respondent has always lived in this State, but that several years ago he was absent for several months; his absence in all, if deducted from the period between the commission of the crime and the filing of the information, reducing the period of his actual presence in the State to less than six years. The statute of limitations applying to crimes deducts from the six years limitation such time 'during which the party charged was not usually and publicly a resident within the State.' [How. St., sec. 9507.] *It is not mere absence from the State which this statute refers to, but such absence as destroys residence.* Otherwise persons would be unable to leave home for any purpose without incurring the risk of consequences which were never contemplated. In Campbell v. White, 22 Mich. 178, the defendant lived immediately over the line, within a mile

or two of Detroit, yet her residence in Windsor was held to be the governing consideration. We think the two statutes were meant to be substantially the same. *Criminal cases really do not stand on the same necessity as civil cases, for absence does not prevent an indictment, while it does prevent the beginning of a civil action.* It is a hardship to postpone criminal proceedings so long that testimony may be lost and the truth difficult to get at. A long delay in complaining does not usually further justice. We think there was nothing in this case to take it out of the statute.''

In Campbell v. White, 22 Mich. 178, cited with approval by the court, the statute contained a proviso that ''if, after any cause of action shall have accrued the person against whom it shall have accrued shall be absent from and reside out of the State, the time of his absence shall not be taken as any part of the time limited for the commencement of the action.'' It will be noted that the Supreme Court treat the two statutes as practically the same. In the course of the opinion the court discusses the meaning of ''absence from and residing out of the State,'' and adopts the language of Mr. Justice WOODRUFF in Chaine v. Wilson, 1 Bosw. 673, that: ''Ordinarily one's *residence* and domicile (if they do not always mean the same thing) are in fact the same, and where they so concur they are that place which we all mean when we speak of one's home. And it may be safely asserted that where *one* has a *home,* as that term is ordinarily used and understood among men, and he habitually resorts to that place for comfort, rest, and relaxation from the cares of business and restoration to health, and there abides in the intervals when business does not call—that is his *residence,* both in the common and legal meaning of the term. And to one who has such a home, and habitually uses it as such, a place of business elsewhere is not his residence within any proper definition of the term.''

But there is a much stronger reason why the court

should have by a proper instruction defined who is "an inhabitant of" the State within the meaning of this statute and the indictment in this case. What time is to be deducted from the three years limitation? The statute answers: that during which the defendant "shall not have been an inhabitant of or usually resident within this State." If defendant was either "an inhabitant of" or "usually resident within the State" he was entitled to go acquit if a distinction is to be made between the two.

The statute does not say "shall not have been an inhabitant of *and* usually resident within this State," but uses the disjunctive connective *or*.

In Com. v. Hadcraft, 69 Ky. 91 (1869), the defendant was indicted under a statute making it an offense to sell any minor spirituous or vinous liquors "unless by *the written consent or request* of the father." The Court of Appeals of Kentucky, in passing upon the sufficiency of the indictment, said: "The act defines the offense to be a sale of liquor to a minor *'without the written* consent *or* request' of the father; but the indictment in this case is so framed as to make the offense complete by so selling, if done without 'the written consent *and* request' of the father; so that, according to the indictment, to have exonerated the defendant on that ground, he should not only have had the *written consent* but also the *written request* of the parent or guardian. It is obvious that the facts stated in the indictment did not constitute the offense defined by the statute," and the judgment was the indictment was bad.

So here, if the circuit court was right in holding that "inhabitant of" and "usual resident" referred to different conditions, the statute did not require defendant should be both "an inhabitant of" and "usually resident within the State," but the running of the statute continued if he was either, and upon its own interpretation of the statute the court erred in instructing the jury that they had nothing to do with the question of whether

defendant was an inhabitant of the State, thus requiring the defendant to be both "an inhabitant and usually resident" to get the benefit of the statute. In State v. Fitzporter, 93 Mo. 390, the defendant was charged with manslaughter in the second degree in having destroyed a quick child in its mother's womb, the same not being necessary to preserve the life of the mother *and* not being advised by a physician that it was necessary for that purpose. Sec. 1241, Revised Statutes 1879, provided the destroying the child under the circumstances was manslaughter "unless the same was necessary to preserve the life of the mother, *or* was advised by a physician to be necessary." The court instructed the jury that if it was not necessary to preserve the life of the mother and the same was not advised by a physician to be necessary, they would find defendant guilty, but this court held the instruction erroneous, saying, "The instruction cast upon the shoulders of the defendant a greater burden than the statute required him to bear." That is, he was entitled to go acquit if it appeared either that it was necessary to save the mother's life or the defendant had been so advised by the physician. So here, if defendant was either an inhabitant or usual resident he was entitled to go acquit even if those expressions are not synonymous. But had the court accepted the construction which we place on this section, namely, that the two phrases were synonymous and equivalents of each other and were used to define and illustrate one status, it would have avoided the difficulty of endeavoring to differentiate the terms and thereby falling into the error of depriving the defendant of the benefit of the statute which secured to him exemption from prosecution if he was *"an inhabitant of the State"* or *"usually resident therein."*

### V.

The fourth instruction given by the court is challenged on various grounds.

The court having in its third instruction told the

jury they were not to consider whether defendant had been during the period of limitation an "inhabitant of Missouri" did not define who was an inhabitant of this State in the meaning of the statute and the indictment, and accordingly the great mass of evidence tending to show he was such an inhabitant was practically eliminated from their consideration.

The instruction does not give a definition of "usual residence" in this State and submit to the jury the facts in evidence to determine whether defendant was or was not usually resident within the State according to the legal definition given by the court.

Instead of so doing the instruction selects certain facts in testimony in regard to the time or times defendant was in the city of New York and instructs the jury that if they find these facts they may find that defendant was not usually a resident within Missouri at such time.

The facts so selected by themselves were not by themselves, when viewed in the light of the law and the other evidence, sufficient to fix defendant's usual residence in New York.

The question at issue on the statute of limitations was whether defendant was inhabitant of or usually resident within Missouri.

That he had, prior to March, 1899 (the time fixed by the State's witnesses when they saw him in New York), a fixed residence and citizenship in Kansas City, Missouri, was conclusively established. For twenty years he had resided with his family in said city and carried on his business and maintained his civic and social relations there. Starting with this conceded fact, the presumption is that he continued to have his residence in Kansas City until he changed that residence. As said by Chief Justice SHAW, in Thorndike v. City of Boston, 42 Mass. 245, "It is a maxim that every man must have a domicile somewhere and also that he can have but one. Of course it follows that his existing domicile continues

until he acquires another, and, vice versa, by acquiring a new domicile he relinquishes his former one. It depends upon the preponderance of the evidence in favor of one of two or more places and it may often occur that the evidence of facts tending to establish the domicile in one place would be entirely conclusive were it not for the existence of facts and circumstances of a still more conclusive and decisive character which fix it, beyond question, in another."

Now the controlling facts upon which the court permitted the jury to find, not that defendant had changed his domicile or residence from Kansas City to New York, but had ceased to be "a usual resident of Missouri," were that after the commission of the offense in March, 1898, "defendant went to New York and there engaged in business and there had a permanent office and place of business and there occupied apartments before and after his marriage which were engaged by the year, having them as an established abode in New York," although the jury might find that he had *a home in Kansas City where his children resided,* and to which he *occasionally* returned." This instruction evidences the wisdom of Chief Justice SHAW in the remark that certain facts tending to establish the domicile in one place would be conclusive were it not for the existence of facts of a still more conclusive character. The vice of this instruction is in asserting that defendant was no longer a *usual resident* of Missouri, if he went to New York and engaged in business and had a permanent office there and occupied apartments at a hotel which were engaged by the year. A man does not lose his domicile and residence because he goes to another State to engage in businesss even if he has a permanent business office in such State. Such facts are not conclusive of a change of residence when facts of far more conclusive character appear as they did in this case, namely, that for years the defendant had been a man of family and lived in Kansas City; that he owned a residence there estimated to

be of the value of $50,000, in which his family and minor
children continuously resided from October, 1897, up to
and including the time of the trial in the circuit court;
that his wife died, and after that time Mrs. Richey, his
sister-in-law, lived with him and kept his house, keeping
his three sons at home; that he had refitted his home in
an expensive manner in the fall of 1897 and spring of
1898; that he was the president of the Mechanics' Bank
of Kansas City until it was merged into the City Na-
tional Bank in January, 1900, and was president of that
until a short time before the trial, when he sold his stock
to Mr. Samuel Jurden of Holden; that the articles of
incorporation of the City National recited he was a resi-
dent of Kansas City and the affidavit required by the
Federal statute stated he was a resident of said city; that
he was married a second time January 1, 1900, in Boston,
and his marriage certificate or license gives his residence
as Kansas City, Missouri; his children attended the pub-
lic schools of Kansas City; his tax receipts for 1897,
1898, 1899 and 1900 and 1901 all describe him as resid-
ing at 2806 Independence avenue, Kansas City; that in
addition to this, twenty-eight residents of Kansas City,
who knew defendant and who knew him well, who had
business and social relations with him in all the varieties
of life, testified to the unbroken continuity of his resi-
dence and business relations in Kansas City, and of
meeting him from day to day as they met other active
business men and residents of Kansas City.   There was
Dingman, the butcher; Cochran, the grocer; MacMillen,
the gas man; Bailey, the insurance man; White, the
teacher of his children in the public schools; Mrs. White,
the teacher of music in his household; Arnold, the letter
carrier; Majors, the private watchman; Yeager, the
lawyer; Crowell, the doctor; Richardson, the pastor;
Mrs. Richey, who, while he was a widower, had charge
of his household and his children; Mrs. Snyder, his
newly-wedded wife; Long, who lived next him on the
east; Dominick, who lived next on the west; Tureman

and Smart, who lived across the street; and Schuler, James, Evans, Heath, Ennis, Mehornay, Gentry and Magill, merchants, with whom he dealt and business men with whom he associated. All speak to his continued residence in Kansas City. Not one of them ever heard of his leaving or intending to leave. Not one of them ever heard of his having abandoned Kansas City and returning to it.

All these facts tended to show that he had a permanent residence in Kansas City from 1897 up to the finding of the indictment. On the other hand, the evidence shows he went to New York in 1899 and was engaged with Konta, Ten Broek and Greenwood in financial ventures there, and had a desk in Bache & Co.'s office, but the witnesses did not state this was *a permanent office,* nor the character of his business transacted there, or whether he rented the desk or whether it was tendered to him merely as an accomodation. It is fundamental that the mere physical change of a man's location does not of itself change his residence. He must have an intention to abandon his old home and residence and an intention and purpose to take up his residence in the new place. But the court nowhere submitted this question of an intention to change his residence from Kansas City to New York to the jury.

As said by the Supreme Court of Michigan in Poople v. McCausey, supra, "It is not a mere absence from the State which this statute refers to, *but such absence as destroys residence;*" or, as put by Chief Justice SHAW in Thorndike's case, "The actual change of one's residence, *with his family,* and the taking up of a residence elsewhere, *without any intention of returning."* A man may have a permanent place of business in another State without affecting his usual residence in the State where he lives and has his permanent home. [Graham v. Com., 51 Pa. St. 258; McCord v. Woodhull, 27 How. Pr. 54; State v. Ross, 23 N. J. Law 527; Kennedy v. Ryall, 67 N. Y. 386.]

We are clearly of the opinion that the court's instruction is erroneous because it maximizes the evidence tending to show defendant had taken up his residence in New York, and in so far as it characterized his place of business there as a *"permanent office and place of business"* was unwarranted comment on the evidence; and on the other hand minimizes the evidence tending to show that his fixed residence was in Kansas City and nowhere gives him the benefit of the presumption that his residence continued in Kansas City until the State had overcome it by showing he had removed to New York without any intention of returning to Kansas City. The first part of the instruction gives an undue prominence to certain inconclusive facts tending to show residence in New York and ignores the opposing facts on behalf of defendant of far more probative value; a practice uniformly condemned by this court in numerous cases. [State v. Hibler, 149 Mo. 478; State v. Rutherford, 152 Mo. 133; Jones v. Jones, 57 Mo. 142.]

We think it clear that the court's two instructions numbered 3 and 4 for the State were erroneous and prejudicial to defendant and did not fairly present his defense of the statute of limitations to the jury.

The burden was on the State to prove the facts which would avoid the bar of the statute and the court should have so charged the jury. When the State closed its evidence in chief, the defendant demurred to the evidence and the circuit court overruled it, saying, however, "I don't feel that the State's case is very strong except as to the admissions which are explicit."

Obviously the defendant in no manner weakened his case by the great array of evidence showing he was an inhabitant and resident of Kansas City within the meaning of our statute defining where a man's residence is. It may be that on a new trial the State can show that defendant had changed his residence from Kansas City and had ceased to be an inhabitant of this State, but unless it produces much more evidence than

appears in this record, to show such a change, the demurrer to the evidence ought to be sustained. We agree with the circuit court in saying that the State's case was not very strong. Indeed, we feel assured that had the circuit court construed "inhabitant of" and "usually resident within" to have meant the same thing, it would have taken the case from the jury. However guilty the defendant may have been by the laws of this State, his offense was barred by the statute of limitations unless he had ceased to be an inhabitant of or usually resident within this State for a time long enough to deprive him of the statute. When we consider that our statute defines what constituted his residence in the State, to-wit, "the place where his family permanently resided in this State," it seems obvious that neither the court nor jury could have escaped the conclusion that his family had a permanent residence in Kansas City continuously from 1897 until after the indictment was found, and that with the exception of the three months spent in Europe on business in 1899 the defendant himself was in Kansas City at his said home for a large portion of the time. Can any court or lawyer doubt that a writ of summons left at his said home with a member of his family over the age of fifteen years would have been a perfectly valid service on him at any time during the four years which elapsed after March 22, 1898? Clearly not.

In criminal statutes of limitation the State surrenders by an act of grace its right to prosecute, and declares the offense shall no longer be the subject of prosecution. Dr. Wharton in his Crim. Prac. and Plead., sec. 316, says: "The statute is not a statute of process to be scantily and grudgingly applied, but an amnesty declaring that after a certain time oblivion shall be cast over the offense." Hence, such statutes are to be liberally construed in favor of the defendant. We are satisfied the circuit court misconstrued the statute in this case, and the defendant was not accorded the benefit which the statute was designed to give him.

## VI.

Again, it is assigned as error that the prosecuting attorney persistently called attention to the defendant's failure to testify, without rebuke from the court.

In his closing address to the jury the circuit attorney in discussing Uthoff's testimony as to the offer of a bribe at his house, said: "When Mr. Snyder wanted to give a bribe he did not go into a public assemblage such as this and hand it to Uthoff before a multitude of witnesses. So there were only two parties present, the man who gives, and the man who takes. So even to punish this crime . . . you must get one of the parties to the transaction to testify, and though both are infamous yet the State must do the best it can, and produce the evidence on the stand in order that the crime may be punished at all. Uthoff is not the kind of a man that I would want to hunt up to associate with, nor would you, but he came upon the stand and told a story that I believe to be true. I believe what he said was the truth *and it has not been denied.*"

To this statement by the circuit attorney, counsel for defendant promptly objected to the court. Whereupon the court inquired what it was, and counsel for defendant said: *"That Uthoff told a story that has not been denied."*

"The court: 'If that has any reference to the defendant not denying it, it is an improper statement and will not be considered by the jury.'

"Mr. Folk: 'I do not refer to any party.'

"Mr. Jourdan: 'I except to the statement, and ask that counsel be rebuked.'

"The Court: 'I tell the jury that it can not have any reference to the defendant.' "

Proceeding, the circuit attorney said: "Now your duty is plain; your duty is clear, after the proof here of the bribery and there was no witness on the defendant's side to deny it."

"Counsel for defendant: 'I object to that statement.'

"The Court: 'That objection is well taken. There can be only one inference drawn from that statement which is an inference which I do not care to believe you wish to draw. The defendant has the right not to testify and his failure to go on the stand is not to be used to the prejudice of his case. You should not comment on it and the jury are directed to disregard your statement.'

"Mr. Jourdan: 'I except to your Honor's statement.'

"Mr. Folk: 'I hope your Honor will not comment on it.'

"Mr. Jourdan: 'I except to the last statement of the prosecuting attorney.'

"The Court: 'The exception is well taken.' "

The statutes of this State permit a defendant to testify in his own behalf, but it is expressly provided by Revised Statutes, sec. 2638, "If the accused shall not avail himself or herself of his or her own right to testify or of the testimony of the wife or husband on the trial in the case, it shall not be construed to affect the innocence or guilt of the accused nor shall the same raise any presumption of guilt nor be referred to by any attorney in the case nor be considered by the court or jury before whom the trial takes place."

The circuit attorney in his closing argument to the jury had called the attention of the jury to the fact that bribery is an offense always committed in secret, to be proved only by the man who gives the bribe or the man who takes it. He pointed out that in this case no one was present except defendant and Uthoff; that Uthoff had come on the stand and told a story which the prosecutor believed to be true, "*and it had not been denied.*"

It is and was obvious to the court and counsel that there could have been no denial of Uthoff's story of what occurred between him and defendant in the privacy of Uthoff's home *except by defendant.* It is true

that when counsel for defendant protested against the statement, the circuit attorney said, "I do not refer to any party," and the court said, "I tell the jury that it can not have any reference to defendant," but notwithstanding the disclaimer of the circuit attorney and the judgment of the circuit court that the statement of the circuit attorney could not have any reference to the defendant, it is apparent that in view of the evidence before the court and the previous argument of the circuit attorney based upon the evidence that only Uthoff and defendant were present when the alleged bribery was committed and as Uthoff had testified to it, there was no other person in existence save the defendant who could deny Uthoff's statement as to what occurred at that secret interview at his house, and no other conclusion can be drawn than that the circuit attorney did refer to defendant's failure to go on the witness stand and deny Uthoff's statement, and that the attention of the jury was thus called to defendant's failure to testify and deny the statement of Uthoff. Taking the narrow limits of the evidence on this point and the language of the circuit attorney just prior to making the assertion that Uthoff's statement "had not been denied," that reference is not susceptible of any other construction.

If the circuit attorney did not so intend it to be understood he was singularly unfortunate in the choice of his words, but whatever his intention the consequence to the defendant and its effect upon the jury was the same. [State v. Deves, 61 Pac. 511; People v. Payne, 91 N. W. 739.] Counsel for defendant so interpreted it and we think correctly did so.

But this is not all. Proceeding, the circuit attorney said: "Your duty is clear after all you have heard, after the proof here of the bribery, and there was *no witness on the defendant's side to deny it.*" Defendant's counsel again objected and the circuit court agreed with him that "only one inference can be drawn from that statement." We think unquestionably the court was

right in its construction of this language, but we think it is no stronger than the first statement by the circuit attorney which we have just considered.

In State v. Dawson, 24 S. W. 414, the Court of Criminal Appeals of Texas had this exact question before it. In that case the district attorney in his argument discussed the evidence of a witness, Yerger, and said: "Gentlemen of the jury, Yerger told these things to their teeth this morning, *and who has denied it?*" Counsel for defendant excepted because it was a comment on defendant's failure to testify. The Court of Appeals on this point said, "Now, there was no one present who could' deny those statements but the accused. They were not made in the presence of any person except Yerger and the accused. And when counsel asked the question, 'Who has denied it?' he must have referred to the fact that the accused had not denied the statements; and the jury, being men of ordinary intelligence, must have so understood counsel, as no other person could have made the denial. The judgment is reversed, and the cause remanded."

At common law one accused of crime could not be compelled to testify in a prosecution against himself nor was he permitted to testify in his own behalf. Experience demonstrated that this deprived the defendant of explaining circumstances which tended to create conclusions of his guilt which he could readily remove if allowed to testify.

To relieve him of this embarrassment statutes like section 2637, Revised Statutes 1899, have been passed in many States of our Union.

It will be noted the next section was framed with due regard to those who might prefer to rely upon that presumption of innocence with which the law surrounds every one charged with crime and has expressly provided that his failure to testify shall not change the presumption of innocence into one of guilt if he de-

clines to testify, and to secure him full protection it is ordained that his failure to testify *shall not be referred to by any attorney in the case or considered by the court or jury.*

The provision has been rigidly enforced by all courts of last resort. [State v. Trauger, 77 N. W. 336; Wilson v. United States, 149 U. S. 60; State v. Weaver, 165 Mo. 13; State v. Anderson, 89 Mo. 330; State v. Graves, 95 Mo. 510; State v. Guinn, 174 Mo. 680.]

In some of the States it is held to be an error which the trial court can not cure by rebuking counsel, or by its instruction to the jury. [Showalter v. State, 84 Ind. 562.]

But this is not all. The remarks of the court in sustaining the objection of the defendant to the circuit attorney's reference to his failure to testify, accentuated the allusion. We are satisfied the court was endeavoring to protect the defendant in his rights, but it is clear that by his manner of doing so the command of the statute was violated.

We are satisfied that prejudicial error was committed by the circuit attorney's allusion to the failure of defendant and his witnesses to deny the evidence of Uthoff.

Guilt is not to be presumed from the failure to disprove any fact. The defendant is presumed innocent until the State establishes his guilt. The burden is not on him to prove his innocence but on the State to show it beyond a reasonable doubt.

This error alone is sufficient to reverse the judgment. [State v. Fairlamb, 121 Mo. 150; State v. Elmer, 115 Mo. 401.]

Other propositions are advanced but the foregoing sufficiently indicate our views.

As to the evidence of the bribery, it was sufficient if believed by the jury to justify the verdict, if defendant was not entitled to the bar of the statute.

For the errors noted the judgment is reversed and the cause remanded.

All concur.